IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TIEN DUC BUI; KIM THI CHAU; <br> MIN, INC.; LAN THI NGO; THAM NGO; <br> ANTHONY HOA NGUYEN; <br> BAO NGUYEN; DANNY NGUYEN; <br> HA THI NGUYEN; HOA HUU NGUYEN; <br> HUE THI NGUYEN; KIEM NGUYEN; <br> KIM-VAN THI NGUYEN; LIEN NGUYEN; <br> OANH KIM NGUYEN; OANH NGUYEN; <br> SON NGUYEN; TAI THI NGUYEN; <br> THIEN THI NGUYEN; THOA T. NGUYEN; <br> VINH NGUYEN; NGUYEN FAMILY, INC.; <br> DEP VAN PHAM; DUC VAN PHAM; <br> HOA PHAM; TAM V. PHAM; <br> CHAU VAN TRAN; ROBERT TRUONG <br> TRAN; TRUNG QUANG TRAN; HOAT VU; <br> DUNG NGOC HUYNH; BONG LAM; <br> NAM QUOC LIEU; NGUYET KIM LIEU; <br> TUAN QUOC LIEU; ANH THI NGUYEN; <br> BIEN VAN NGUYEN; LEE VAN NGUYEN; <br> P & N ENTERPRISE, INC.; CHIN VAN <br> TRAN; MEN T. TRAN; NGAN T. TRAN; <br> and SUE YANG <br>            PLAINTIFFS <br><br> V. <br> BP, PLC; BP PRODUCTS NORTH <br> AMERICA, INC. ; BP AMERICA, INC.; <br> TRANSOCEAN, LTD; <br> TRANSOCEAN OFFSHORE <br> DEEPWATER DRILLING, INC.; <br> TRANSOCEAN DEEPWATER, INC.; <br> AND HALLIBURTON ENERGY <br> SERVICES, INC. <br>            DEFENDANTS | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> §    CASE NO. _____ <br> § <br> § <br> § <br> § <br> § <br> § <br> § |

**PLAINTIFFS' ORIGINAL COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

      NOW COME **TIEN DUC BUI; KIM THI CHAU; MIN, INC.; LAN THI NGO;**

**THAM NGO; ANTHONY HOA NGUYEN; BAO NGUYEN; DANNY NGUYEN; HA THI**

NGUYEN; HOA HUU NGUYEN; HUE THI NGUYEN; KIEM NGUYEN; KIM-VAN THI NGUYEN; LIEN NGUYEN; OANH KIM NGUYEN; OANH NGUYEN; SON NGUYEN; TAI THI NGUYEN; THIEN THI NGUYEN; THOA T. NGUYEN; VINH NGUYEN; NGUYEN FAMILY, INC.; DEP VAN PHAM; DUC VAN PHAM; HOA PHAM; TAM V. PHAM; CHAU VAN TRAN; ROBERT TRUONG TRAN; TRUNG QUANG TRAN; HOAT VU; DUNG NGOC HUYNH; BONG LAM; NAM QUOC LIEU; NGUYET KIM LIEU; TUAN QUOC LIEU; ANH THI NGUYEN; BIEN VAN NGUYEN; LEE VAN NGUYEN; P & N ENTERPRISE, INC.; CHIN VAN TRAN; MEN T. TRAN; NGAN T. TRAN; and SUE YANG. (sometimes referred to collectively herein as "Plaintiffs"),and file this their Original Complaint complaining of the Defendants identified below (sometimes referred to collectively herein as "Defendants"), and would respectfully show the Court as follows:

## I.
## INTRODUCTION

1.     For years, the massive offshore drilling rig DEEPWATER HORIZON (hereinafter "DEEPWATER HORIZON" or "Drilling Rig") has been engaged in dangerous, deep-water drilling in a fragile ecosystem off the coast of Louisiana. Although its owners and operators and its main contractors were well-aware of the state and federal laws regulating oil drilling, the design, location and operation of the Drilling Rig was not in compliance with these laws. Although its owners and operators, and its main contractors were well-aware of the dangers of oil spills—grave dangers that affected not only their employees, but ecosystems throughout the Gulf of Mexico and the livelihoods of millions of Gulf Coast residents—they did not take even the most basic precautions to avoid oil spills. On April 20, 2010, the negligence of Defendants resulted in the greatest environmental catastrophe in a generation.

2.       At about 10:00 p.m. central time on April 20, 2010, an explosion occurred on the
DEEPWATER HORIZON. Had the Drilling Rig been operated, serviced and maintained
correctly, the resulting fire could have been contained. But it was not. Had the Drilling Rig been
equipped with a proper remote-controlled shut-off switch, as rigs operated by nations ranging
from Brazil to Norway are, the well could have been closed, limiting the damage to the Drilling
Rig itself. But it was not. By the time the Drilling Rig sank on April 22, 2010 it was leaking
thousands of barrels a day, creating a thick and viscous oil slick, larger than the state of Rhode
Island. The oil slick has caused catastrophic damage to the fragile ecosystem of the Gulf of
Mexico, including coastal fisheries upon which millions of Americans depend, has poisoned
estuaries, choked livelihoods, and smothered the local economy for years to come.  It also has
led to the devastating loss of business and income to a multitude of businesses operating along
the Gulf Coast, including Plaintiffs named above.

## II
## JURISDICTION AND VENUE

3.       Plaintiffs assert these claims under the Oil Pollution Act, 33 USC § 2700 *et seq*.
Accordingly, this Court has jurisdiction pursuant to 28 USC § 1331.

4.       Venue is proper in this Court because several of the Defendants reside within the
Southern District of Texas.

### III
### PARTIES

**5.**     Plaintiffs herein are:

**TIEN DUC BUI; KIM THI CHAU; MIN, INC.; LAN THI NGO; THAM NGO; ANTHONY HOA NGUYEN; BAO NGUYEN; DANNY NGUYEN; HA THI NGUYEN; HOA HUU NGUYEN; HUE THI NGUYEN; KIEM NGUYEN; KIM-VAN THI NGUYEN; LIEN NGUYEN; OANH KIM NGUYEN; OANH NGUYEN; SON NGUYEN; TAI THI NGUYEN; THIEN THI NGUYEN; THOA T. NGUYEN; VINH NGUYEN; NGUYEN FAMILY, INC.; DEP VAN PHAM; DUC VAN PHAM; HOA PHAM; TAM V. PHAM; CHAU VAN TRAN; ROBERT TRUONG TRAN; TRUNG QUANG TRAN; HOAT VU; DUNG NGOC HUYNH; BONG LAM; NAM QUOC LIEU; NGUYET KIM LIEU; TUAN QUOC LIEU; ANH THI NGUYEN; BIEN VAN NGUYEN; LEE VAN NGUYEN; P & N ENTERPRISE, INC.; CHIN VAN TRAN; MEN T. TRAN; NGAN T. TRAN; and SUE YANG.**  Each of the Plaintiffs works in the shrimping or fishing-related industries, and the majority of Plaintiffs both reside and work within or offshore of the Beaumont Division of the Eastern District of Texas (while a minority of Plaintiffs live or work within or offshore of the Southern District of Texas, Galveston or Houston Division).

Defendants herein are:

(a)     BP, plc ("BP"), is a British corporation doing business in the State of Texas, who may be served with process through its registered agent, at North American Headquarters, 28300 Torch Parkway, Warrenville, IL 60555-3938.

(b)     BP Products North America, Inc. ("BP Products"), a Maryland corporation doing business in the State of Texas, who may be served through its registered agent, Prentice Hall Corp System, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

4

(c)     BP America, Inc. ("BP America"), a Delaware corporation doing business in the State of Texas may be served through its registered agent, C T Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201.

(d)     Transocean, Ltd., ("Transocean, Ltd.") is a Swiss corporation doing business in the State of Texas, who may be served through its registered agent at Tumstrasse 30, CH-6300 Zug, Switzerland.

(e)     Transocean Offshore Deepwater Drilling, Inc. ("Transocean Offshore"), is a Delaware Corporation doing business in the State of Texas, who may be served through its registered agent, Capitol Corporate Services, Inc., 800 Brazos, Suite 400, Austin, TX 78701.

(f)     Transocean Deepwater, Inc. ("Transocean Deepwater"), is a Delaware corporation doing business in the State of Texas.  This defendant does not have a registered agent on file in Texas.

(g)     Halliburton Energy Services, Inc. ("Halliburton"), a Delaware corporation doing business in the State Texas, may be served through its registered agent, C T Corporation System, 350 N. St. Paul St., Suite 2900, Dallas, Texas 75201.

## IV.
## FACTUAL ALLEGATIONS

6.     Transocean, Ltd., Transocean Offshore and Transocean Deepwater (collectively "Transocean") are the owners and/or operators of the DEEPWATER HORIZON, a semi-submersible offshore mobile drilling rig, which was performing completion operations for BP, BP Products and BP America on the outer Continental Shelf, at the site from which the Oil Spill originated, on April 20, 2010.

7.     BP, BP Products and BP America (collectively "BP") are the holders of a lease granted by the United States Minerals Management Services (sometimes "MMS"), who allowed

BP to drill for oil and perform oil-production-related operations at the site of the well and Oil Spill. On April 20, 2010, BP operated the oil well that is the source of the Oil Spill.

8.    Halliburton was engaged in cementing operations of the well and well cap and, upon information and belief, improperly and negligently performed these duties, increasing the pressure at the well and contributing to the fire, explosion and resulting Oil Spill.

9.    It is well-known in the oil extraction industry that drilling rigs can be equipped with remote-controlled shut-off switches. This inexpensive precaution allows the owner of the Drilling Rig, or its operator, leaseholder, or others aboard, to close the well via remote signal in the event of a rig or well malfunction, thereby preventing an Oil Spill. Because of their low cost and obvious safety benefits, remote-controlled shut-off switches are used in oil rigs throughout the world, in nations ranging from Brazil to Norway.

10.    Upon information and belief, Defendants, and each of them, were aware of the danger posed by not installing a remote-controlled shut-off switch on the DEEPWATER HORIZON. Specifically, Defendants were aware that failing to install such a device on the DEEPWATER HORIZON would greatly increase the danger of an Oil Spill that would choke and poison thousands of square miles of marine and coastal ecosystems in the Gulf of Mexico and create havoc in the maritime-related businesses operating in or along the Gulf of Mexico. Defendants, who have made record profits in the past decade, also were aware that such a device could be installed on the DEEPWATER HORIZON at negligible cost.

11.    Defendants, and each of them, failed to install a remote-controlled shut-off switch on the DEEPWATER HORIZON and otherwise were negligent in causing or contributing to the spill, the delay in responding to it, and in causing the enormous damages sustained by offshore-

related businesses working or operating on or along the Gulf of Mexico, including Plaintiff.

12.     At all times material hereto, the DEEPWATER HORIZON was owned, manned, possessed, managed, controlled, chartered and/or operated by Transocean and/or BP.

13.     Upon information and belief, Defendants, and each of them, were fully aware that deep-water oil drilling is significantly more dangerous than drilling in other areas. Defendants were fully aware that deep-water drilling cannot be carried out safely when using equipment that is inadequately designed or poorly maintained.

14.     Although Defendants knew or should have known that the DEEPWATER HORIZON had a defective Blow-Out Preventer (hereinafter sometimes "BOP") and was not equipped with a remote shut-off switch, Defendants chose to use the DEEPWATER HORIZON to drill *the deepest oil well in history* in September 2009.

15.     On April 20, 2010, an explosion occurred on the DEEPWATER HORIZON. Since the BOPs failed to operate, the explosion was not contained, and fire began spreading throughout the vessel. Since Defendants negligently chose not to equip the DEEPWATER HORIZON with a proper remote shut-off switch, the flow of oil well was not shut-off.   The explosion and fire caused multiple leaks in the still-pressurized pipe through which the DEEPWATER HORIZON had been extracting oil.

16.     On April 22, 2010, the DEEPWATER HORIZON sank.  When Defendants first learned of the Oil Spill, they reported that the well was leaking approximately 1,000 barrels per day. The Oil Spill was in fact leaking by a more likely 20,000 to 100,000 barrels per day. On information and belief, Defendants impaired the response to the emergency, greatly increasing the danger to the environment, human health, and the Gulf Coast economy, by knowingly understating the amount of oil that was leaking from the well.

17.     The spilled oil did not simply evaporate off of the surface of the water. Instead, it formed a vast expanse of thick, poisonous sludge, contaminating an area larger than the state of Rhode Island. The oil slick continued to expand until the ruptured pipe was shut off, some 87 days later, eventually dumping an estimated 4.9 million barrels of oil into the Gulf of Mexico.

18.     The rapidly-expanding oil slick affected hundreds of species of fish, birds, and other wildlife in one of the planet's richest marine ecosystems. It has crippled, and may entirely destroy, one of only two breeding grounds in the world for Atlantic Bluefin tuna, greatly increasing the likelihood that this species will go extinct in the near future. It devastated Louisiana's vulnerable wetlands, which were still recovering from the damage caused by Hurricane Katrina, and has further poisoned thousands of miles of already-fragile estuaries in Louisiana and other Gulf States, including Texas, Mississippi, Alabama, and Western Florida.

19.     The oil contained approximately 40% methane by weight, compared to about 5% found in typical oil deposits.  Methane can suffocate marine life and create "dead zones," where oxygen is depleted.  During a January 2013 flyover, former NASA physicist Bonny Schumaker noted a "dearth of marine life" in a radius 30 to 50 miles (48 to 80 km) around the well.   In March 2012, a definitive link was found between the death of a Gulf coral community and the spill.

20.     The oil slick has threatened human health. A number of studies have linked oil contamination with significantly increased risk of cancer and other illnesses. Louisiana's fishing and tourism industries may never recover to pre-spill levels.  Millions of Gulf Coast residents have been exposed to the toxins released by this Oil Spill. Whether through fishing, boating, or simply breathing the air in their homes, these Gulf Coast residents will continue to suffer the consequences of Defendants' negligence for decades to come.

8

21.    In addition to its effects on the environment and human health, the oil slick was an economic catastrophe for the Gulf States. Millions of businesses and individuals on the Gulf Coast, including Plaintiffs, who are shrimpers, fishermen, fish-processing workers, or businesses and owners/operators of same and directly engaged in fishing, fish-processing or sales, face the permanent loss of their businesses and livelihoods.  For example, Louisiana's fishing industry, which has been valued at $3 billion and is the source of one third of the seafood consumed in the United States, is expected to lose as much as $2.5 billion. Given the permanent damage that the oil slick did to fisheries, including shrimp spawning grounds, this loss will be difficult or impossible to recover. Florida's tourism industry is expected to lose at least $3 billion, and the tourism industry of Louisiana faces similarly catastrophic losses.

22.    The public image of this region—an image on which the livelihoods of millions of Gulf Coast residents depend, particularly in an area as reliant on tourism and seafood--- has suffered grave and irreparable damage. Tourists once associated this region with the history and culture of New Orleans, the natural beauty of the Gulf Coast, and the taste of some of the nation's best seafood. For years to come, the public will view the Gulf Coast as a "poisoned place", a once-living land suffocated by the viscous blight of an uncontained oil slick.

23.    The fire and explosion on the DEEPWATER HORIZON, its sinking, and the resulting Oil Spill were caused by the inexcusable negligence and/or recklessness of Defendants, which renders them liable jointly, severally and *in-solido* to Plaintiff for its damages.

24.    The harm suffered by Plaintiffs was caused by Defendants' violations of numerous statutes and regulations, including, but not limited to, statutes and regulations issued by OSHA and the United States Coast Guard, including the requirement to test the sub-sea BOPs at regular intervals.

25.    Defendants knew of the dangers associated with deep water drilling and failed to take appropriate measures to prevent damage to Plaintiffs, Louisiana's and the Gulf of Mexico's marine and coastal environments and estuarine areas, the commercial waters of the Gulf of Mexico, and the Coastal Zone, where Plaintiffs worked and earned its income and its employees earning their livings.

26.    As stated above, Plaintiffs are shrimpers, fishermen or otherwise personally engaged in shrimp or fishing-related businesses, or own or operate businesses of this type.  Due to the BP Oil Spill and resultant damage to the shrimp, shellfish, other fish, and the marine environment generally, and the negative media and publicity attention, which scared consumers and the public generally from purchasing Gulf of Mexico shrimp and fish, demand for Plaintiffs' shellfish and fishing-related products dried up and essentially disappeared.  As a result, Plaintiffs suffered significant financial damages, which in all reasonable probability will continue to occur for months and years into the future.

27.    Consequently, Plaintiffs not only sustained direct past economic losses, but also sustained a loss of use of future natural resources, habitat and their livelihood and revenues from such resources.

28.    In addition, on April 30, 2010, only 10 days after the Spill began, President Obama ordered the US Secretary of the Interior to report, within 30 days, on "what, if any, additional precautions and technology should be required to improve the safety of oil and gas exploration and production operations on the Outer Continental Shelf." About a week later, the Secretary of the Interior announced that "as a result of the Deepwater Horizon explosion and spill, beginning April 20 ‒ the date of the explosion ‒ no applications for drilling permits [would] go forward for any new offshore drilling activity." On May 27, 2010, the Secretary of

the Interior issued a further report, which recommended: (1) "a six-month moratorium on permits for new wells being drilled"; and (2) "an immediate halt to drilling operations on the 33 permitted wells that [were] currently being drilled using floating rigs in the Gulf of Mexico." The next day, May 28, 2010, the Secretary of the Interior issued further statements, including:

> "that offshore drilling of new deepwater wells poses an unacceptable threat of serious and irreparable harm", and decreed "a six-month suspension of all pending, current, or approved offshore drilling operations... For those operators who are currently drilling new deepwater wells, they shall halt drilling activity... [and] the [Mineral Management Service ("MMS")] shall not process any new applications for permits to drill."

29.    There were approximately 4,500 active leases in the Gulf of Mexico deepwater drilling area at that time. That Moratorium on new drilling and on continuation of the wells that were currently being drilled continued in effect until October 12, 2010, which was shortly before the Moratorium's anticipated six-month time limit expired. Moreover, MMS continued to fail to issue permits to allow offshore deepwater drilling for months thereafter, which effectively prevented Plaintiff's customers from purchasing products and services from Plaintiff.

30.    As a result of the continuing negative press and publicity and the Federal Government's pronouncements about damage to the maritime environment in the Gulf of Mexico, even more consumers of Gulf of Mexico shellfish and related fishing products have stopped or limited their purchases, further damaging Plaintiffs. Such damages were foreseeable, as Defendants knew or should have known what likely would follow from the Oil Spill, which was caused by their negligence.

31.    Plaintiffs have submitted claims to the *Deepwater Horizon* court-Supervised Settlement program, which was implemented in connection with the *Deepwater Horizon* Economic and Property Damages Settlement Agreement arising from the BP MDL case, pending in Federal Court in the Eastern District of Louisiana, New Orleans, in Cause # 2:10 md-2179.

Plaintiffs contend they are proper member of the *Deepwater Horizon* Economic and Property Damages Settlement class (the "DWH" Class). Nevertheless, BP has disputed or appears likely to dispute one or more Plaintiffs' status as proper DWH Class Members and their entitlement to recover their full damages, and/or the claims Administrator for the *Deepwater Horizon* Court-Supervised Settlement Program has taken action suggesting that one or more Plaintiffs or their right to recover full damages on their claims may be excluded from the DWH Class. Accordingly, out of an abundance of caution, Plaintiffs also are filing this action to protect and preserve their claims and rights against the Defendants. Should Plaintiffs finally be determined to be proper DWH Class Members, and then awarded all their damages in conjunction with the DWH Class, Plaintiffs will take appropriate action in this case with respect to claims asserted herein which are or may become resolved based upon their status and recoveries under the DWH Class.

32.     There are other potential effects from the Oil Spill that have not yet become known, and Plaintiffs reserve the right to amend this Complaint once additional information becomes available.

## V.
## CAUSES OF ACTION
### Negligence

33.     The fire, explosion and resulting spill was caused by the negligence of the Defendants. Upon information and belief, Plaintiffs aver that the fire, explosion and resulting Oil Spill was caused by the joint negligence and fault of the Defendants in the following non-exclusive particulars:

a.     Failing to properly operate the DEEPWATER HORIZON;

b.     Operating the DEEPWATER HORIZON in such a manner that a fire and explosion occurred onboard, causing it to sink and resulting in an Oil Spill;

c.     Failing to properly inspect the DEEPWATER HORIZON to assure that its equipment and personnel were fit for their intended purpose;

d.     Acting in a careless and negligent manner, without due regard for the safety of others;

e.     Failing to promulgate, implement and enforce rules and regulations pertaining to the safe operations of the DEEPWATER HORIZON which, if they had been so promulgated, implemented and enforced, would have averted the fire, explosion, sinking and Oil Spill;

f.     Operating the DEEPWATER HORIZON with untrained and unlicensed personnel;

g.     Inadequate and negligent training and hiring of personnel;

h.     Failing to take appropriate action to avoid or mitigate the accident and the continuing Oil Spill;

i.     Negligent implementation of policies and procedures to safely conduct offshore operations in the Gulf of Mexico;

j.     Employing untrained or poorly-trained employees, and failing to properly train their employees;

k.     Failing to ascertain that the DEEPWATER HORIZON and its equipment were free from defects and/or in proper working order;

l.     Failure to timely warn;

m.     Failure to timely bring the oil release and spill under control;

n.     Failure to provide appropriate accident prevention equipment;

o.     Failure to observe and read gauges that would have indicated excessive pressures in the well;

p.     Failure to react to danger signs;

q.     Providing BOPs that did not work properly;

r.     Conducting well and well-cap cementing operations improperly;

s.     Failing to equip the DEEPWATER HORIZON with a remote shut-off switch;

t.     Acting in a manner that justifies imposition of punitive damages;

u.      Impairing the emergency response by under-stating the extent of the oil leak in the days following April 20, 2010; and

v.      Such other acts of negligence, misconduct and omissions as will be shown at the trial of this matter.

34.      In addition, and in the alternative, the fire, explosion, sinking and resulting Oil Spill were caused by defective equipment, including the BOPs, which were in the care, custody, and control of Defendants. Defendants knew or should have known of these defects and Defendants are, therefore, liable for them.

35.      The harm to Plaintiffs also was caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

36.      In addition to the negligent actions described above, and in the alternative thereto, the harm suffered by Plaintiffs were caused by the acts and/or omissions of the Defendants that are beyond proof by the Plaintiffs, but which were within the knowledge and control of the Defendants, there being no other possible conclusion than that the fire, explosion, sinking and Oil Spill resulted from the negligence of Defendants. Furthermore, the fire, explosion, sinking and the resulting Oil Spill would not have occurred had the Defendants exercised the high degree of care imposed on them and Plaintiffs, therefore, plead the doctrine of *res ipsa loquitur*.

37.      Plaintiffs are entitled to a judgment finding Defendants liable for damages suffered as a result of Defendants' negligence and awarding Plaintiffs adequate compensation therefor in amounts determined by the trier of fact.

## Oil Pollution Act

38.      Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if fully copied herein.

14

39.     The Oil Pollution Act (hereinafter sometimes "OPA") imposes liability upon a "responsible party for a... facility from which oil is discharged...into or upon navigable waters or adjoining shorelines" for the "damages that result from such incident." 33 U.S.C. § 2702.

40.     Section 2702(b)(2)(C) of OPA also provides for the recovery of "[d]amages for subsistence use of natural resources, which shall be recoverable by any claimant who so uses natural resources which have been injured, destroyed, or lost, without regard to the ownership or management of the resources."

41.     The United States Coast Guard has identified BP as the responsible party. Therefore, BP is liable pursuant to Section 2702 of OPA for all the damages that result from the Oil Spill.

42.     As a result of the Oil Spill, Plaintiffs have been economically and financially injured and damaged to the extent of extensive and likely permanent damage to their fishing resources and other natural resources, the decline in market and value of their catches, and the decline in value to its business and its assets, which were its most valuable property.

43.     Section 2702(b)(2)(E) of OPA provides for the recovery of "[d]amages equal to the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources, which shall be recoverable by any claimant."

44.     As a result of the Oil Spill, Plaintiffs have suffered the type and category of damages which are recoverable pursuant to Section 2702(b)(2)(E) of OPA, and they demand full compensation therefor, from BP in amounts to be determined by the trier of fact.

45.     To the extent required by law, and/or by consent and/or by stipulation by BP, as required by 33 U.S.C. section 2713 (a), Plaintiffs have presented a demand for a sum certain as required by 33 U.S.C. section 2713 (a) by the submission of its claims to BP OPA, Claims

Program, the Deepwater Horizon Court-Supervised Settlement Program, and/or the Gulf Coast Claims Facility. Additionally, Plaintiffs submitted their written claims, including demand for a sum certain and a description of the claims, as well as supporting documentation, to BP as the "responsible party" under OPA, via certified mail.

46.     Plaintiffs have presented their claims to the responsible party pursuant to Section 2713 (a) of OPA.

47.     BP failed to respond to the claims and did not settle Plaintiffs' claims by payment within 90 days of presentment, as required by OPA. Transocean has neither advertised nor established an OPA process

## VI.
## DAMAGES

48.     Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if fully copied herein.

49.     The conduct of the Defendants, jointly and severally, as alleged herein above, was a direct, proximate and producing cause of the damages suffered by Plaintiffs, for which Plaintiffs sue.

## VII.
## EXEMPLARY DAMAGES

50.     Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if fully copied herein.

51.     Defendants' acts or omissions, as described above, were intentional, fraudulent and, when viewed from the standpoint of Defendants at the time of the act, or omissions, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiffs and others. Defendants had actual, subjective awareness of the risk involved in

the above-described acts or omissions, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiffs and others.

52.      The Defendants' conduct was in violation of applicable Federal safety, construction, and/or operating regulations by the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party.  Consequently, Plaintiffs contend that any otherwise-applying limits on exemplary and punitive damages do not apply.

53.      Based on the facts stated herein, Plaintiffs request exemplary damages be awarded to Plaintiffs from Defendants.

## VIII.
## JURY DEMAND

54.      Plaintiffs demand a jury trial and tender the appropriate fee with this petition.

## IV.
## PRAYER

55.      WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that the Defendants be cited to appear and answer herein, and that, upon a final hearing of the cause, judgment be entered for the Plaintiffs against Defendants for damages as determined and awarded by the jury in an amount within the jurisdictional limits of the Court, including exemplary damages, together with: pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate; costs of court; and such other and further relief to which Plaintiffs may be entitled at law or in equity.

Respectfully Submitted,

By: _____

THE LANIER LAW FIRM

W. MARK LANIER
State Bar No. 11934600
CHARLES F. HERD, JR.
State Bar No. 09504480
FELICIA M. HUBERT
State Bar No. 17635900
6810 FM 1960 West
Houston, Texas  77069
TEL:  (713) 659-5200
FAX:  (713) 659-2204

**ATTORNEYS FOR PLAINTIFFS**